## Helm v. Leader.

### (Decided January 30, 1925.)

### Appeal from Warren Circuit Court.

Landlord and Tenant—Evidence Held to Show Defendant Liable as Hotel Lessee's Silent Partner or as Lessee After he Inserted Name in Lease.—In lessor's action for rent, evidence held to show that defendant, who wrote in his name as lessee of hotel after original lessee's name, was either original lessee's silent partner from beginning or became lessee thereafter.

GAINES & GARDNER and RODES & HARLIN for appellant.

THOMAS, THOMAS & LOGAN for appellee.

OPINION OF THE COURT BY JUDGE THOMAS—Reversing.

Appellant and plaintiff below, T. O. Helm, owned some real property in the city of Bowling Green, Ken-

tucky, known as the Morehead Hotel, and on November 1, 1920, he entered into a written contract with Julius Krouskoff whereby he rented that property for one year from that date at an agreed rental per month payable semi-monthly. The lessee took charge of the property under the lease contract and operated it as a hotel, paying the rent as agreed for about one month, when the written lease was altered by appellee and defendant, M. Leader, writing his name therein following that of Krouskoff as a party of the second part in three of the places where the original lessee's name appeared therein; but failing to insert his name at three other places in conjunction with that of the original lessee, and defendant also subscribed his name at the bottom of the lease as a party thereto. Some two weeks thereafter Krouskoff disappeared from Bowling Green, and so far as this record shows he has not been heard from since. In the meantime he had installed as clerk and manager of the hotel a mutual friend of both himself and Leader by the name of Louis Bernstein, who issued checks for the expenses signed by himself as manager. From the beginning the defendant, Leader, was around and about the hotel, and after Krouskoff disappeared the record abundantly shows that he took complete charge of its running and management. He moved into it and occupied a room, paying no rent therefor, and looked after the purchasing of supplies as well as making repairs on the inside of the building and directed Bernstein to pay therefor. He superintended all of the help employed in the running and operation of the hotel, and busied himself generally as behooves a diligent and watchful proprietor of such an establishment. The rent was paid as per terms of the contract up to about June 1, 1921, after which there was a slackness in that regard, and after it had fallen behind about $3,000.00 the lessor, Helm, informed Leader that unless the past due rent was paid or in some manner taken care of legal proceedings would be taken to collect it, and within a short while after such notification defendant disappeared from Bowling Green and returned to the place in Georgia from whence he came to Bowling Green and from which place Krouskoff, Bernstein and a close relative of defendant, Sam Zbar, also resided, operating in connection with each other a mercantile business before they appeared in Bowling Green; but Bernstein continued to operate the hotel as manager until the expiration of the written

lease on November 1, 1921, at which time there was, as alleged in plaintiff's pleading, a balance of rental due him of $4,925.00, plus an item of $239.50 paid by plaintiff but which was due to be paid by the lessees, and this action was brought in the Warren circuit court against Leader to recover those items.

Attachment was sued out and levied on some leasehold interest and rights owned by defendant in Warren county and an amended petition sought to subject other property which it was alleged had been fraudulently conveyed by defendant to one M. A. Rosansky, and that conveyance was sought to be set aside and subjected to plaintiff's debt. The answer denied that defendant, Leader, was ever the lessee of the hotel property and affirmed that he had nothing to do with its management throughout the period covered by the contract. He also alleged that after Krouskoff disappeared the hotel was rented by plaintiff to Bernstein, who operated it for and on behalf of himself under a different stipulated rent and that Bernstein had paid that rent. By another paragraph he asserted a counterclaim against plaintiff consisting of eight or nine items aggregating $8,358.00, which he claims was necessary to be spent in repairs that plaintiff, under the contract, was obligated to make but refused to do so which paragraph of course was clearly inconsistent with other portions of his answer, and was not available unless he was a party to the contract.

The case was tried in equity by consent of parties and the court referred the issues to the master commissioner who took proof and reported that Leader was not a lessee of the property either under the written contract or otherwise and the court, upon exceptions filed to that report, overruled them and dismissed the petition, from which judgment plaintiff prosecutes this appeal. It will, therefore, be seen that the only issue which the court decided and upon which the case was finally disposed of in the trial court was and is one of fact, i. e., whether Leader was a silent partner from the beginning with Krouskoff, or if not did he become the lessee thereafter and operate the property as such from the time Krouskoff abandoned the lease and disappeared?

Plaintiff, who is a man of high integrity and business standing in his community, testified that Leader some time before the lease was executed came to him and

recommended his friend Krouskoff, who was then in Georgia, as an extremely suitable and adapted person to run and operate a hotel; that he had experience in that business and that he felt sure that plaintiff could succeed in leasing the hotel to him. Some correspondence ensued between plaintiff and Krouskoff and within a short while he appeared in Bowling Green, which trip culminated in the execution of the contract; that some weeks thereafter Leader approached plaintiff and stated to him that he had been a lessee partner with Krouskoff from the beginning and inquired of plaintiff if he had objections thereto, when the latter informed him that he had no objections, but that if he was a lessee he should insert his name as such in the contract, and that defendant thereupon in his own handwriting wrote into the contract his name as a lessee thereunder jointly with Krouskoff and subscribed his name to the contract at the end thereof as one of its executers; that within ten days or two weeks thereafter, Leader again approached him and stated that he was dissatisfied with Krouskoff and his temperament and methods and wanted plaintiff to assist him in eliminating Krouskoff and getting rid of him as a partner; that he (plaintiff) informed defendant that the only way he knew to accomplish that purpose was to buy out his partner and suggested that he make an offer to him to give or take, whereupon defendant informed him that Krouskoff would not take less than $2,500.00 and retire, while he (defendant) had offered him $1,500.00, which he declined to take, and that thereafter and before Krouskoff left, he (plaintiff) was informed by both Leader and Krouskoff that the former had paid the latter $1,500.00 to retire.

On the other hand, while defendant admitted a portion of the plaintiff's testimony that we have recited, he denied the circumstances under which his name was inserted in the contract, though admitted that he made the insertion. His explanation of the reason why he inserted his name in the lease contract and why he subscribed it is the most silly, unreasonable, farfetched and unbelievable of any similar explanation that has come under our observation up to the present time. It is not only at variance with business methods and experiences of mankind in such commercial transactions, but it is inherently incredulous. That our characterization of it is true, we

have concluded, at the expense of some space, to incorporate that explanation in this opinion, and it is:

"The doctor came to me and told me that he found out he (Krouskoff) was not much good, that he makes too much faults with the trade and fights his negroes in the house, and the doctor when he run the hotel himself he hired Mrs. Claypool for one year at the rate of $100.00 per month, and the doctor told me that Mr. Krouskoff give notice to Mrs. Claypool that his wife could run it and he wouldn't want her, and doctor thought he would have to pay Mrs. Claypool for the balance of the year, and furthermore he didn't like him, and he said, 'You introduced me to him, you ought to help me get him out,' and I said, 'I will do more for you than I would do for Krouskoff; he is nothing more to me than a friend; I just merely know him;' and he say, 'I will tell you what I will do, if you will come and sign the contract and I tell him that you stood his bond and I will give you permission to get off under the contract and if he can't give it I will tell him to move,' and I was talking to the doctor time after time, and one time doctor told me he got his contract and 'If you will sign it I will get rid of him,' and I says, 'I am willing to help you all I can, but I don't want to get mixed up that way,' and one night he slipped the contract out and had me to sign it, and I signed it here, and he said, 'Sign here,' and I said, 'That is enough, I don't sign any more,' and next morning doctor called in Mr. Krouskoff and he says, 'Mr. Leader has stood your bond for the hotel and I give you permission to get off at any time you want to,' and he said, 'I don't think I rented the hotel from you on a surety bond; Leader has nothing to do with it; I have spent so much money, and if you had told me I wouldn't have gone to all that expense,' and doctor says, 'I am mighty sorry; look for your contract,' and Julius went to look for some one to give his bond, and doctor left for New York on December 20th, and Julius went out about December 20th."

It readily will be seen by even the casual reader that the inserted explanation is on a par with numerous bandied jokes in universal circulation with reference to the members of the race to which Leader, Krouskoff, Bernstein and Zbar belong, and when measured by the

rules for the detection of truth it is clearly found wanting. In the first place, why should Leader obligate himself in a contract providing for the payment of $18,600.00 rental with only a verbal understanding that he was not to become bound? In the next place, the scheme suggested by Leader for Helm to get rid of Krouskoff was not one that even a halfwit would suggest, because there was no provision in the original contract for the single lessee therein to give bond or security for the rent, and he had a copy of his contract and could at once meet the suggestion contained in the explanation by saying that Leader never became his surety, but that if he did later sign the contract as such he could not be ousted by failing to supply another surety, since he never agreed to furnish any. A thorough and minute analysis of that explanation will subject it to still other criticisms as to its credulity, but what we have said, plus what occurred afterwards, abundantly refutes the testimony of defendant and his witnesses, Bernstein and Zbar, who attempt to corroborate him, and to sustain plaintiff in his testimony, the substance of which we have heretofore outlined.

In addition to defendant's operating the hotel, his occupying a part of it without paying any rent and his general supervision of it, all of which we have hereinbefore stated, a number of witnesses testified, some of which was undenied by defendant, that he stated on divers and sundry occasions that he had bought out Krouskoff and that he was the sole proprietor and operator of the hotel. He paid a note of $500.00 at a bank which he had signed with Krouskoff, and Bernstein gave to the latter just before his departure a check on the hotel deposit for the sum of $1,000.00, which substantiates the proven statements by defendant that he had bought out his partner at a cost of $1,500.00. More than that, the contract provided for an inventory of the contents of the hotel at the expiration of the lease, and just before defendant left he took an inventory as therein provided, which is directly at variance with his present contention that he had nothing more to do with the hotel "than his handkerchief." Still more, he went with Krouskoff, before the latter's departure, to Hopkinsville to buy the Latham Hotel and offered to purchase it at the sum of $130,000.00, showing that he was interested in the hotel business and was imbued with the idea that it was a profitable one. We could more than double the above

recited list of facts and circumstances proven in the case, all going to establish beyond doubt that the defendant was in truth and in fact a lessee of plaintiff's hotel under the written contract and demonstrating that defendant's testimony was wholly unbelievable, but such a course would unduly lengthen this opinion. It is sufficient to say that the master commissioner in his report based his conclusions exclusively upon the number of the witnesses, i. e., three for the defense, including the defendant, and only plaintiff testifying for himself as to the reasons why the defendant's name became connected with the contract and the capacity in which he displayed activity in its management, which conclusion ignores the proven statements of defendant by others while the management was going on and the utterly unreliable nature of the testimony given by the three witnesses. One of those circumstances which might be mentioned was that Bernstein claimed that he was running the hotel and paying a different rental from that stipulated in the contract, and which he was to guarantee, and pay it out of the income, and yet he testified that he was to receive $150.00 per month as his wages from the same income which, in substance, was that he agreed to run and operate the hotel and pay himself wages therefor, all of which of course is denied by plaintiff and which testimony by Bernstein is altogether out of harmony with the conduct of the parties in the payment of the rent after Krouskoff left in semi-monthly installments as stipulated in the written contract up to about June 1, 1921; and also it is out of harmony with Bernstein's testimony that he and not Leader became the lessee on the terms stated by him after Krouskoff's retirement. Another fact which has occurred to us is, that if Bernstein was running and operating the hotel it is passing strange that he declined to charge defendant for the occupancy of one of the choice rooms therein. Upon the whole, we have no hesitancy in concluding that defendant became and was liable for the rent sued for and that the commissioner was in error in reporting otherwise, and that the court was likewise in error in confirming that report.

No report was made by the commissioner on any of the items of the counterclaim, nor was there any judgment with reference to them, although there was some evidence taken directed to those issues and which shows

that the amounts were unduly exaggerated, even if defendant is liable for any part of any of them; but since there has been no finding with reference to them, we refrain from deciding any of those issues, and upon a return of the case the court will enter judgment in favor of plaintiff for the balance of the rent together with any other amount included in his pleadings and sustained by the evidence, and will credit that judgment by any amount which the court may find from the evidence is due defendant under his counterclaim. For the same reason no expression of opinion is given concerning the attacked fraudulent conveyance made in plaintiff's pleading, and that issue will be determined by the court at the second hearing.

Wherefore, the judgment is reversed with directions to set it aside and for proceedings consistent with this opinion.